# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

-------------------------------------------------------------------X

|  |  |  |
|---|---|---|
| **MARCUS HAMILTON**; **WINTHROP EATON**; and **MICHAEL PERRY**, on their own behalf, and on behalf of a class of similarly situated prisoners, | : : : : | |
| *Plaintiffs*, | : : | |
| -against- | : : | **CLASS ACTION COMPLAINT AND** |
| **DARREL VANNOY**, Warden of Angola; **BURL CAIN**, former Warden of Angola; **JAMES CRUZE**, Warden of Death Row; **LESLIE DUPONT**, Deputy Warden of Security; and **JAMES LEBLANC**, Secretary of the Louisiana Department of Public Safety Corrections, | : : : : : : | **DEMAND FOR JURY TRIAL** |
| *Defendants*. | : : | |

-------------------------------------------------------------------X

This class action challenges the policies and practices responsible for the cruel and baseless placement of prisoners who are in prolonged and complete isolation on death row at Louisiana State Penitentiary, also known as Angola ("Death Row").

## PRELIMINARY STATEMENT

1.    Based solely on their death sentence, Marcus Hamilton, Winthrop "Earl" Eaton and Michael Perry (collectively, "Plaintiffs") have been isolated in solitary confinement on Death Row between twenty-five to thirty-one years.  Over three quarters of the more than seventy prisoners currently on Death Row have been in solitary confinement for over a decade, and none of them have ever had a meaningful opportunity to challenge this placement.

2.    Plaintiffs and the similarly situated prisoners on Death Row (the "Class Members") are subjected to indefinite extreme isolation, devoid of mental stimulation and having only sporadic human interaction.  They are confined for twenty-three hours a day to small,

windowless cells – the size of an average home bathroom – and are permitted to leave their cell, one at a time, for only one hour a day to shower, use the phone and walk along the tier where their cells are located. Three times a week, they are allowed to spend this hour outside, in isolation, in a small outdoor cage resembling a dog pen. Physical human contact of any kind is completely prohibited.

3. The harsh repercussions of prolonged isolation are well-known among mental health experts, physicians and human rights experts in the United States and around the world. It is agreed that solitary confinement puts prisoners at risk of substantial physical, mental and emotional harm. Research has shown that prolonged solitary confinement results in heightened levels of anxiety, chronic depression and sensitivity to stimuli.

4. In recent years, leaders in the United States have condemned the use of solitary confinement as inhumane. As Justice Anthony Kennedy noted: "[R]esearch still confirms what this Court suggested over a century ago: Years on end of near-total isolation exact a terrible price." *Davis v. Ayala*, 135 S. Ct. 2187, 2210 (2015) (Kennedy, J., concurring). In describing the *Davis* case, in which a prisoner had been held in isolation for twenty-five years, to the House Appropriations Subcommittee on Financial Services and General Government, Justice Kennedy stated: "This idea of total incarceration just isn't working, and it's not humane. . . . . Solitary confinement literally drives men mad."[1] Similarly, Justice Stephen Breyer recently wrote that "if extended solitary confinement alone raises serious constitutional questions, then 20 years of solitary confinement, all while under threat of execution, must raise similar questions, and to a rare degree, and with particular intensity." *Ruiz v. Texas*, No. 16-7792, 2017 WL 901080, at *2 (U.S. Mar. 7, 2017).

---

[1] Supreme Court Fiscal Year 2016 Budget at 30:42-31:22 (C-SPAN television broadcast Mar. 23, 2015), goo.gl/8Hkuvj.

5.     These dehumanizing conditions are detrimental to the Class Members and have caused them severe and irreversible physical and psychological harm.  Over time, these Class Members have slowly lost their cognitive capacities and ability to communicate effectively.  Additionally, any pre-existing mental health illnesses of the Class Members have been exacerbated by the isolated confinement.

6.     Social interaction and meaningful activity are crucial to human well-being.  By definition, solitary confinement isolates individuals and stunts any mental or emotional stimulation.  Even healthy adults, if subjected to very short periods of isolation, display impaired neurological functioning.   Here, the prolonged nature of the confinement has had a devastating impact on the Class Members.

7.     There is no legitimate or valid penological reason to place Class Members in solitary confinement based exclusively on their sentence.  Numerous corrections officials across the United States promote prison classification systems based on several objective factors, such as age and prison disciplinary history, because these factors, as opposed to a prisoner's sentence, are more predictive of potential security concerns.  Similarly, a 2016 report conducted by the Department of Justice ("DOJ") recommends the use of solitary confinement only when it serves a specific penal purpose and when accompanied by regular review by a multi-disciplinary committee.

8.     Contrary to these recommendations, Class Members – irrespective of their good behavior – have been held in solitary confinement for decades without any rational justification and without being afforded any process or mechanism to address their confinement or to rectify the harm it has inflicted on them.   The extreme, unusual and cruel conditions of their confinement violate the Eighth and Fourteenth Amendments of the United States Constitution.

3

9.      Defendants, who are employed by the State of Louisiana, acted under color of law to deprive Class Members of their constitutionally protected right to be free of cruel and unusual punishment, guaranteed by the Eighth Amendment of the United States Constitution, and their right to due process, guaranteed by the Fourteenth Amendment.  Class Members seek relief from Defendants to address these grave violations of their constitutional rights.

## JURISDICTION AND VENUE

10.      Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments of the United States Constitution.

11.      This Court has jurisdiction over Plaintiffs' claims of violation of their federal constitutional rights pursuant to 28 U.S.C. §§ 1331 and 1343.

12.      Venue is proper pursuant to 28 U.S.C § 1391(b) because a substantial part of the events giving rise to the claims herein occurred in this district.

## PARTIES

13.      **Plaintiff MARCUS HAMILTON** is a fifty-six-year-old prisoner who has spent the past twenty-five years in solitary confinement at Angola.  He was sentenced to death in 1991. He is currently housed on Death Row, Tier A.

14.      **Plaintiff WINTHROP "EARL" EATON** is a fifty-two-year-old prisoner who has spent the past thirty years in solitary confinement at Angola.  He was sentenced to death in 1987.  He is currently housed on Death Row, Tier F.

15.      **Plaintiff MICHAEL OWEN PERRY** is a sixty-three-year-old prisoner who has spent the past thirty-one years in solitary confinement at Angola.  He was sentenced to death in 1985.  He is currently housed on Death Row, Tier B.

4

16.    **Defendant DARREL S. VANNOY** is the Warden of Angola.  He became acting Warden in December 2015 and formally took on the role in July 2016.  In this capacity, he makes operational decisions at Angola related to areas of staffing, budget and administration.  As such, Defendant Vannoy authorizes or condones the unconstitutional policy of housing all Death Row prisoners in solitary confinement indefinitely, as described herein.  Therefore, he directly and proximately caused the constitutional violations set forth below.  At all relevant times, Defendant Vannoy was acting under color of law and as an official representative of Angola. Defendant Vannoy is sued in his official capacity for injunctive relief and in his personal capacity for damages.

17.    **Defendant BURL CAIN** was Warden of Angola from 1995-2016.   In that capacity, he made operational decisions at Angola related to areas of staffing, budget and administration.  As such, Defendant Cain authorized, condoned or knowingly acquiesced to the unconstitutional policy of housing all Death Row prisoners in solitary confinement indefinitely, as described herein.  Therefore, he directly and proximately caused the constitutional violations set forth below.  At all relevant times, Defendant Cain was acting under color of law and as an official representative of Angola.  Defendant Cain is sued in his personal capacity for damages.

18.    **Defendant JAMES CRUZE** is the Warden of Death Row.  In this capacity, he makes staffing, budget and administrative decisions related to the operation of Death Row and is responsible for protecting the constitutional rights of all prisoners housed on Death Row, including the Class Members.   As such, Defendant Cruze authorizes or condones the unconstitutional policy of housing all Death Row prisoners in solitary confinement indefinitely, as described herein.  Therefore, he directly and proximately caused the constitutional violations set forth below.  At all relevant times, Defendant Cruze was acting under color of law and as an

5

official representative of Angola.  Defendant Cruze is sued in his official capacity for injunctive relief and in his personal capacity for damages.

19.    **Defendant LESLIE DUPONT** is the Deputy Warden of Security.   In this capacity, he makes staffing and administrative decisions related to security at Angola.  As such, Defendant Dupont authorizes or condones the unconstitutional policy of housing all Death Row prisoners in solitary confinement indefinitely, as described herein.  Therefore, he directly and proximately caused the constitutional violations set forth below.  At all relevant times, Defendant Dupont was acting under color of law and as an official representative of Angola.  Defendant Dupont is sued in his official capacity for injunctive relief and in his personal capacity for damages.

20.    **Defendant JAMES LEBLANC** is the Secretary of the Louisiana Department of Public Safety Corrections (the "Department").  In this capacity, he is responsible for protecting the constitutional rights of all individuals in the custody of the Department of Corrections, including prisoners housed on Death Row.  Additionally, Defendant LeBlanc determines rules, regulations, and policy regarding management, personnel, and the overall operation of the Department, including Angola and the prison's Death Row facility.  He authorizes or condones the unconstitutional policy of housing all Death Row prisoners in solitary confinement indefinitely, as described herein.  Therefore, Defendant LeBlanc directly and proximately caused the constitutional violations set forth below.  At all relevant times, Defendant LeBlanc was acting under color of law and as an official representative of the Department.  Defendant LeBlanc is sued in his official capacity for injunctive relief and in his personal capacity for damages.

## FACTS COMMON TO ALL CAUSES OF ACTION

### *Angola's History*

21.     The history of Angola (also known as "the Farm") as a former slave plantation is well-known.  Although the conditions at Angola have significantly improved since the prison's founding, it remains one of the harshest maximum-security prisons in the country.

22.     Angola is composed of the Main Prison Complex, where most of Angola's minimum and medium security prisoners are housed, as well as separate housing units known as "out-camps," which house prisoners with various classifications.  Death Row is an "out-camp" that houses death-sentenced inmates as well as Closed Cell Restrictions ("CCR"), which is also a solitary confinement unit.

### *The Death Row Facility*

23.     Death Row houses all male Louisiana state prisoners sentenced to death.  There are currently seventy prisoners housed on Death Row.

24.     Due to flooding at Louisiana Correctional Institute for Women, one woman is temporarily serving her death sentence in Angola's Camp F.  Although she is not currently housed on Death Row, she is living in the same restrictive environment.

25.     In 2006, a new facility was constructed at Angola to house Death Row inmates. Prior to 2006, the Death Row facility was housed in other areas of the prison, including the Receiving Center and the Treatment Center, but Plaintiffs and Class Members have always been kept in solitary confinement.

26.     The current Death Row facility is one of several housing units that collectively make up the Angola prison.  The Death Row unit measures 25,000 square feet and consists of a

central area around which four housing wings are arranged.  The central area houses cell block/central control, inmate support areas and administrative support areas.

27.    Each of the four housing sections holds two tiers of cells.  The tiers are given designations A-H.  Each tier contains between twelve to sixteen cells and a tier walkway.  Each cell houses one prisoner. The ceiling, floor and walls of each inmate cell are made of concrete and separated from the tier by metal bars.  Upon information and belief, each cell measures about eight feet by ten feet.  Each cell has a combined toilet and a sink, a metal mirror, a table with a stool bolted to the floor, a metal slab as a bed that is attached to the wall and the floor and a foot locker.  The Death Row facility does not have air conditioning, but rather fans on the tier that circulate hot summer air.[2]

28.    Approximately nine feet across from the security metal bars are translucent glass louver windows, covered in metal bars that measure approximately two feet wide by four feet tall.  The windows cannot be reached by the inmates from their cells.  These windows provide the only (very limited) access to natural light as there are no windows inside the cell.

### *Solitary Confinement on Death Row*

29.    Anyone sentenced to death is automatically confined to solitary confinement on Death Row upon their arrival at Angola.  Their placement in solitary confinement is not based on violation of prison rules, behavioral considerations, or anything other than their death sentence.  In contrast to other prisoners at Angola, those on Death Row are denied any opportunity to challenge their placement in solitary confinement through any administrative means, nor are they given periodic reviews to determine whether they need to remain in solitary confinement.  There is no opportunity for prisoners on Death Row to challenge their solitary confinement, even after

---

[2] Federal judge frustrated with Louisiana's opposition to air conditioning for Angola's death row, ASSOCIATED PRESS (May 20, 2016), goo.gl/rpu2ZM.

years of exemplary behavior, unless their sentence is reversed, in which case they are immediately removed from Death Row and placed into general population.

30.     Those on Death Row are forced to spend twenty-three hours a day isolated in cramped, windowless cells where they are deprived of any intellectual stimulation.  Physical contact is forbidden, and the absence of meaningful human interaction severely impacts their mental and physical health.  Prisoners are shackled at the ankles and their arms are restricted by a waist chain every time they leave the tier.  As described by one former Death Row inmate, "you have no human contact other than when they put the chains on you."

31.     Death Row prisoners are allowed out of their cell, one on each tier at a time, for only one hour each day.  The one-hour time period outside their cell is not chosen by the prisoner and could be very early in the morning.  During this hour, prisoners are permitted to use the phone, shower, or walk along the tier walkway where their cells are located.

32.     Additionally, three times a week, if weather permits, prisoners are allowed to use part of their hour out of their cell to go outside to the exercise pens.  Only one prisoner is allowed in a pen at any given time.

33.     Upon information and belief, there are ten outdoor pens for the Death Row inmates.  The outdoor pens resemble dog cages.  They have a concrete floor but are fully enclosed by a wire fence on all sides, including on the top.  There is no shade.  Upon information and belief, the pens measure roughly ten feet by ten feet, making the space inadequate for physical exercise for the average-sized man.  There is no equipment for the prisoners to use other than a basketball and a hoop.  Because the wire fence roof offers no protection from direct sunlight and the oppressive summer heat, physical exercise is effectively unavailable to prisoners for several months out of the year.

9

34.    Unlike other prisoners, Death Row prisoners are restricted in what they may purchase at the commissary.  If prisoners want to purchase new clothing, as the low-quality clothing they are provided deteriorates rapidly, they must do so at the commissary.  This is difficult for most Death Row inmates since none of these prisoners have the ability to earn any money while on Death Row.

35.    Whereas the prisoners in main prison or in other out-camps are allowed access to employment and the ability to earn money that is, in part, deposited into their commissary accounts, prisoners on Death Row are not able to be employed and have no opportunity to earn money to even slightly improve their situation in solitary confinement.  Furthermore, unlike the prisoners in general population, Death Row prisoners may not work in the prison's several hobby craft shops and are banned from participating in the sale of hobby crafts, including at the Angola Rodeo held in October and April each year.

36.    Similarly, Death Row prisoners' activities are severely restricted; they are not permitted to participate in any of the wide variety of classes, clubs and trainings available to other prisoners, and they are denied access to any kind of vocational, recreational or educational programs.  Because they are not permitted to participate in any programs and not allowed to work, prisoners on Death Row spend almost all of their time in their cell idle and without any mental or sensory stimulation.  Death Row prisoners are not allowed to possess any arts and crafts or drawing materials.

37.    Prisoners in the main prison have access to religious services as often as they would like.  Death Row inmates, on the other hand, can participate in religious services for, at most, one hour a week.  Priests and ministers from various denominations occasionally visit Death Row and perform religious services outside near the outdoor pens, regardless of the

weather. Death Row prisoners attend the religious services from inside those outdoor pens. Because only one prisoner is allowed in a pen at a time, and there are only ten outdoor pens, only ten Death Row prisoners can go to a religious service at a time. Upon information and belief, the Death Row inmates are shackled at the waist during the service.

38.    Prisoners on Death Row are only allowed to be visited by persons who have been approved to visit, which, at times, has been restricted to blood relatives and limited in number. Visits occur Friday through Sunday and are typically limited to two hours.

39.    Visits at Death Row take place in non-contact visiting rooms and prisoners remain shackled at the waist during visitations. Glass separates the prisoner from the visitors, and communication is by phone.

40.    Unlike prisoners in the main prison who live in a dormitory setting or those in a cell-block who are constantly interacting with one another, prisoners on Death Row are locked in their cells twenty-three hours a day and, aside from visits, have little contact with non-prison officials. Even during visits, prisoners are denied any kind of physical contact with their family members.

41.    In contrast, prisoners housed in general population at Angola, a maximum security prison, have very few restrictions compared to Death Row inmates. For the most part, they spend much of their days outside of their cells and dorms engaging in work and other programs. Most prisoners are free to visit chapels, regular and law libraries, educational classes, gyms and sports activities. They can participate in a wide-variety of prisoner organizations, such as the Lifers Organization, the Angola Drama Club, veterans' organizations, Angola Human Relations Club, Dale Carnegie Club, Malachi Dads and bands, among many others. They also have the opportunity to volunteer at the hospice, assist infirm prisoners and the prison's radio

and TV stations.  They can participate in the semi-annual rodeos, religious services and groups, self-awareness programs, banquets and a variety of call-outs.  They can freely socialize with other prisoners.  Visiting for most prisoners are contact visits and occur in large rooms with other prisoners and their visitors.  The dormitories, in which most prisoners in general population sleep, typically hold over sixty prisoners in an airy, well-lit room with large windows.  The working cell-blocks are two-man cells; the men leave their cells each day to perform their jobs and can participate in yard and other call-outs when not working.

42.    Upon information and belief, many Death Row prisoners suffer from mental illness, which is exacerbated by being held in long-term isolated confinement.  Despite the fact that Defendants are aware of the prevalence of mental illness among this population and of the well-documented effects of solitary confinement on prisoners with mental illness, they provide inadequate mental health care to Death Row prisoners.  Although a social worker visits the tier periodically, the social worker quickly moves from cell to cell asking the prisoners if they need any help.  These visits do not provide the relief that these prisoners need.  Prisoners must first be able to articulate a need for mental health services, which many prisoners who suffer from mental health illnesses are unable to do.  Additionally, because prisoners must first make the request and detail their needs publicly in order to get mental health assistance, many prisoners are unwilling to ask for assistance knowing that their request will be heard by others on the tier.  If an individual does not speak up in front of everyone when the social worker does the tier round, they are not given the opportunity to seek treatment.

43.    The prisoners on Death Row slowly lose their ability to function normally and eventually mentally decompensate due to their solitary confinement.  Plaintiff Marcus Hamilton, who has been on Death Row for twenty-five years, has observed how prisoners change after

years on the row. He has seen formerly articulate prisoners slowly lose their mind and their ability to hold logical conversations and interact with others.

44. As a result of Angola's blanket policy of placing all Death Row prisoners in solitary confinement, Winthrop Eaton, Marcus Hamilton, Michael Perry, and all the Class Members whom they seek to represent, spend twenty-three hours each day in complete isolation and are denied the normal human interaction that is necessary to sustain proper mental health and physical well-being. This blanket policy of placing all Death Row prisoners in permanent and prolonged solitary confinement without a means to challenge placement at any time violates the Class Members' constitutional rights.

### *Plaintiffs' Confinement on Death Row*

Marcus Hamilton

45. Plaintiff Marcus Hamilton has spent the past twenty-five years in solitary confinement and does not receive any visits from his family. He struggles to manage his extreme isolation. He does his best to keep his mind sharp and to ward off the debilitating effects of continuous isolation by conducting his own bible study and writing to pen pals, but he is unable to find a substitute for true, meaningful human contact. Mr. Hamilton also suffers from insomnia and is unable to sleep without the use of medicine. Additionally, Mr. Hamilton suffers from hypertension, a condition linked to prolonged solitary confinement. Upon information and belief, Mr. Hamilton's mental and physical impairments have been caused and/or exacerbated by his prolonged solitary confinement.

46. Mr. Hamilton's intense isolation was most tangible and overwhelming the day he learned via newspaper reports that his mother and younger sister were murdered. The news left him distraught and hopeless as there was nothing he could do from inside his cell. His feelings

of powerlessness were intensified by not being able to properly process the tragedy or speak to close friends or confidants about it.

47.    Over twenty-five years ago, Mr. Hamilton suffered a brain aneurysm that rendered the left side of his body paralyzed. His left arm is contracted into an immobile position with no range of motion and is functionally unusable. The paralysis is especially painful in the hot summer and cold winter months. In certain months, Mr. Hamilton cannot go outside because the extreme weather aggravates his pain. Mr. Hamilton initially received much-needed physical therapy once a year. The treatment helped loosen up his arm and eased the pain; however, it has been at least two years since he last received treatment for it. Since then, his left arm has deteriorated significantly and is practically useless. He tries his best to use his right arm to exercise his injured arm, but without proper therapy, he risks further damaging his injured arm and damaging his good arm.

48.    Mr. Hamilton is currently housed in Tier A, the Death Row tier designated for tours to the public. During the public tours, Death Row inmates in Tier A feel like "zoo animals" stuck "in a cage." Mr. Hamilton has not had a disciplinary violation in over a decade. Indeed, this is precisely why he is currently housed in Tier A, which is an area of Death Row where prisoners who have not had disciplinary problems are housed. He is not housed in solitary confinement for any reasons relating to his behavior.

Winthrop "Earl" Eaton

49.    Plaintiff Winthrop "Earl" Eaton has been in solitary confinement for the past thirty years. He has been diagnosed with schizophrenia and has been deemed incompetent to be executed. Mr. Eaton spends the majority of his time alone in his cell watching television. He

does not receive visitors and has no monetary support. Mr. Eaton's parents no longer visit him because they are too elderly to travel to the prison's remote location.

50.    Mr. Eaton's mental health disorder has been exacerbated by his isolated confinement. Without any visitation, Mr. Eaton suffers from lack of human contact. He does not make eye contact and rarely speaks, but when he does, he does so in two to three word sentences evidencing his limited cognitive ability. Mr. Eaton is unable to hold any kind of meaningful conversation; therefore, even during his one hour out of his cell, he has little to no social interaction, which causes his mental health and cognitive ability to further deteriorate. He is currently prescribed antipsychotic medications, Risperdal and Haldol. Aside from his medication, Mr. Eaton is not receiving any mental health treatment.

51.    Mr. Eaton complies with prison rules and is not in solitary confinement for any reasons relating to his behavior.

Michael Perry

52.    Plaintiff Michael Perry, who has been in solitary confinement for the past thirty-one years, has been diagnosed with schizoaffective disorder and has been deemed incompetent to be executed. Being forced to spend all but one hour of his day in isolation for the past thirty-one years has worsened his mental state. He is currently prescribed antipsychotic medications, Haldol and Prolixin. Aside from his medication, Mr. Perry is not receiving any mental health treatment. Mr. Perry's ability to communicate is extremely limited. His speech is mostly nonsensical, and his comprehension is very low. Mr. Perry suffers from hallucinations and psychosis and is unable to hold a productive conversation. He is "ignored" by the prison guards because he cannot communicate his needs. Upon information and belief, Mr. Perry's mental impairments have been exacerbated by his prolonged placement in solitary confinement.

53.    Additionally, Mr. Perry is unable to maintain basic hygiene.  He does not receive any visits and has no financial support.  Without visitors and with deteriorating cognitive ability, Mr. Perry is left to languish in his cell without adequate sensory stimuli or human interaction.

54.    Mr. Perry does not display any troublesome behavior and is not housed in solitary confinement for any reasons relating to his behavior.  Upon information and belief, Mr. Perry has not had any recent disciplinary issues.

*Prisoners Housed in Prolonged Solitary Confinement Suffer Severe Harm*

55.    Plaintiffs' psychological symptoms mirror those reported in the literature about individuals placed in prolonged solitary confinement. [3]   Indeed, the extreme duration of Plaintiffs' and fellow Class Members' confinement has meant that the effects of solitary confinement have become even more pronounced.

56.    Prolonged solitary confinement indisputably causes painful, severe and at times irreversible harm.  The physical and psychological harm of prolonged solitary confinement has been well-documented for decades.  Indeed, there is a substantial body of literature that has documented distinctive and inescapable patterns of negative physiological and psychological harm when individuals are placed in long-term solitary confinement.  Spanning as far back as the 1960s, studies on the effects of solitary confinement have reported observable negative effects

---

[3] There is consensus in the literature that prisoners subjected to solitary confinement, even for a relatively short amount of time, risk severe emotional, psychological and physiological damage. *See, e.g.*, Shames et al., *Solitary Confinement: Common Misconceptions and Emerging Safe Alternatives* 17, Vera Inst. of Justice (May 2015) (noting that after only seven days in solitary confinement, prisoners experience a range of symptoms including "hypersensitivity to stimuli, distortions and hallucinations, increased anxiety and nervousness, diminished impulse control, severe and chronic depression, appetite loss and weight loss, heart palpitations, talking to oneself, problems sleeping, nightmares, [and] self-mutilation"), goo.gl/tmH1nc; Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 WASH. UNIV. J. L. & POL'Y 325, 338 (2006) ("By now the potentially catastrophic effects of restricted environmental stimulation have been the subject of a voluminous medical literature."); Ass'n of State Corr. Adm'rs, The Arthur Liman Pub. Interest Program, Yale Law School, *Aiming to Reduce Time-In-Cell: Reports from Correctional Systems on the Numbers of Prisoners in Restricted Housing and on the Potential of Policy Changes to Bring About Reforms* 22 (Nov. 2016).

amongst prisoners subject to such conditions.[4]  As stated by one prison staff psychiatrist in 2002, "[i]t's a standard psychiatric concept, if you put people in isolation, they will go insane . . . Most people in isolation will fall apart."[5]

57.     By definition, solitary confinement isolates prisoners from social interactions, restricts their environmental stimulation and affords them no control over their daily life.  This combination of factors results in a series of harmful psychiatric effects, including hypersensitivity to external stimuli, perception distortions, claustrophobia, delusions and hallucinations and panic attacks.  Minimal social and environmental stimulation has serious effects on an individual's mental functioning.  Prisoners housed in solitary confinement report difficulty with thinking, concentration and memory, intrusive obsessional thoughts, increased anxiety and nervousness, overt paranoia, severe and chronic depression and problems with impulse control.[6]

58.     Senior researchers at renowned institutes found physiological effects may be directly caused by the prisoners' physical state of confinement.[7]  For example, lower levels of brain function as a result of solitary confinement, including a decline of electroencephalogram

---

[4] *See* Bruno M. Cormier & Paul J. Williams, *Excessive Deprivation of Liberty,* 11 CANADIAN PSYCHIATRIC ASSOCIATION JOURNAL 470-484 (1966); Hans Toch, *Men in Crisis: Human Breakdowns in Prison* (1975); Craig Haney & Mona Lynch, *Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement*, 23 N.Y.U. REV. L. & SOC. CHANGE 477 (1997).

[5] Human Rights Watch, *Ill-Equipped: U.S. Prisons and Offenders with Mental Illness* 149 & n. 512 (2003), goo.gl/ZxgPRB (emphasis omitted).

[6] Am. Civil Liberties Union, *The Dangerous Overuse of Solitary Confinement in the United States* 4 & nn. 15-25 (Aug. 2014) (citing countless studies discussing the effects of solitary confinement), goo.gl/Iwcbq3; Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 CRIME & DELINQUENCY 130-132 (2003) (referencing various studies on solitary confinement), goo.gl/0Qfp2V; Solitary Watch, *Fact Sheet: Psychological Effects of Solitary Confinement* 1 (2011), goo.gl/NCsvHY.

[7] Peter Smith is a senior researcher at the Danish Institute for Human Rights. *See* Peter Scharff Smith, *The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature*, 34 CRIME & JUSTICE 441 (2006), goo.gl/2glujG.  Sharon Shalev is a research associate at the University of Oxford Faculty of law and an independent consultant on the use and consequences of solitary confinement. *See* https://www.law.ox.ac.uk/people/sharon-shalev.

activities after only seven days in solitary confinement, have been observed.[8]  Additionally, prisoners complain of abdominal pains, as well as muscle pains in the neck and back, which may be caused by the long periods of inactivity.[9]  Further, many researchers conclude that some adverse consequences of solitary confinement are a direct result of sensory deprivation.[10]  This sensory deprivation often times leads to an increased oversensitivity to normal stimuli; for example, for someone experiencing this kind of deprivation, a closing door could be something that could lead to sleeping difficulties.[11]

59.    Studies have also shown that depriving individuals of social interactions by placing them in solitary confinement over a long period of time can destroy their ability to function normally.[12]  Additionally, studies have found that many individuals in solitary confinement will suffer permanent harm as a result of their confinement, even upon its termination.[13]  As explained by one survivor of solitary confinement, "[l]ife in the vacuum of a cell is spirit-killing, mind-altering, and the zenith of human cruelty . . . . Deprived of the frame of reference that social interaction provides, you lose the sense of yourself as part of a larger whole, the context in which your existence has meaning.  You struggle to keep your sanity because in the vacuum of that cell, where there is no meaning, your mind tries to create meaning out of nothing, and this can lead you to confuse fantasy with reality."[14]

---

[8] Grassian, *supra* note 3, at 335-336.

[9] Smith, *supra* note 7, at 489.

[10] *Id.*

[11] *Id.*

[12] Haney & Lynch*, supra* note 4.

[13] Grassian, *supra* note 3, at 332-333.

[14] Wilbert Rideau & Linda LaBranche, *44 Years in Solitary Confinement is Even Worse Than You Can Imagine*, MOTHER JONES, Feb. 22, 2016, goo.gl/yr5X9G.

60.     In addition to the psychiatric symptoms, risk of self-harm, self-mutilation and suicide is much higher for individuals in solitary confinement.   A 2007 study investigating attempted suicide in six state prison facilities in Oregon identified solitary confinement as one of the main factors in suicidal thoughts and suicide attempts.[15]   One study recently found inmates in solitary confinement in New York City jails were 6.9 times more likely to commit self-harm than those in the general population.[16]   Even more tragically, approximately fifty percent of prisoner suicides occur among prisoners in solitary confinement.[17]   One court recently noted that solitary confinement in Indiana resulted in a disproportionately higher percentage of suicides among prisoners in segregation compared with those in the general population.[18]

61.     Adverse physiological effects of isolation are especially significant for persons with serious mental illness.   Deprivations in solitary confinement exacerbate symptoms of mental illness or provoke a recurrence, and can cause severe impairment in one's ability to function.[19]   As the DOJ noted in a 2014 investigation of the Pennsylvania Department of Corrections, isolating prisoners with serious mental illness "exacerbates their mental illness and

---

[15] Ildiko Suto, Doctoral Dissertation, *Inmates Who Attempted Suicide in Prison: A Qualitative Study* 43, Pac. Univ. (July 2007), goo.gl/1ZGqpo; Am. Psychiatric Ass'n Task Force, *Psychiatric Services in Jails and Prisons* (2d ed. 2000).

[16] Fatos Kaba et al., *Solitary Confinement and Risk of Self-Harm Among Jail Inmates,* 104 Am. J. Pub. Health 442-447 (Mar. 2014), goo.gl/dma34K.

[17] Stuart Grassian & Terry Kupers, *The Colorado Study vs. the Reality of Supermax Confinement* 11 (2011), goo.gl/ERzw3z.

[18] *Ind. Prot. & Advocacy Servs. Comm'n v. Comm'r*, No. 1:08-CV-01317-TWP-MJD, 2012 WL 6738517, at *16 (S.D. Ind. Dec. 31, 2012).

[19] Human Rights Watch, Callous and Cruel: Use of Force against Inmates with Mental Disabilities in US Jails and Prisons 32-36 (May 2015), goo.gl/3n2j9S; Maureen L. O'Keefe et al., *One Year Longitudinal Study of the Psychological Effects of Administrative Segregation*, Nat'l Inst. of Justice (Oct. 31, 2010), goo.gl/pFT8Ov.

leads to serious psychological and physiological harm . . . including severe mental deterioration, psychotic decompensation, and acts of self-harm."[20]

62.    A 2016 DOJ report, aimed at offering recommendations for safely reducing the use of restrictive housing, includes guiding principles for American correctional facilities.  The Guidelines states that "inmates with serious mental illness (SMI) should not be placed in restrictive housing."[21]  Similarly, Human Rights Watch recommends that prisoners with mental disabilities should not be housed in solitary confinement.[22]

63.    Recognizing the dangers associated with prolonged solitary confinement, numerous major legal and medical organizations have issued statements opposing long-term solitary confinement.  For example, the American Bar Association (ABA) mandates that "[s]egregated housing should be for the briefest term and under the least restrictive conditions practicable."[23]  Similarly, a bipartisan Commission on Safety and Abuse in America's Prisons commissioned by the Vera Institute of Justice recommended that correctional facilities "[e]nd conditions of isolation," calling solitary confinement "expensive and soul-destroying." [24] Members of the Commission include a former Chief Judge of the U.S. Court of Appeals for the Third Circuit, a former Attorney General of the United States, a former Director of the Southern

---

[20] Letter from Jocelyn Samuels, Acting Assistant Att'y Gen., Civil Rights Div., U.S. Dep't of Justice, to Hon. Tom Corbett, Governor 3 (Feb. 24, 2014), goo.gl/TyUZyT (investigation of the Pennsylvania Department of Corrections' Use of Solitary Confinement on Prisoners with Serious Mental Illness and/or Intellectual Disabilities).

[21] U.S. Dep't Justice, Report and Recommendations Concerning the Use of Restrictive Housing 99 (Jan. 2016), goo.gl/ky0xEg.

[22] Callous and Cruel, *supra* note 19.

[23] ABA Standards for Criminal Justice, *Treatment of Prisoners* Standard 23-2.6(a), at 50 (3d ed. 2011), goo.gl/zIBJ8E.

[24] John J. Gibbons & Nicholas de B. Katzenbach, Report, *Confronting Confinement* 14, 59, Comm'n on Safety & Abuse in Am. Prisons (June 2006), goo.gl/67sNwX.

Center for Human Rights Law, a former prisoner and a former federal prison warden.[25]  In 2012, the American Psychiatric Association (APA) issued a formal policy statement against solitary confinement, noting that "[p]rolonged segregation of adult inmates with serious mental illness, with rare exceptions, should be avoided due to the potential for harm to such inmates."[26]

### *Requiring All Death Row Prisoners to be Housed in Solitary Confinement Does Not Promote Safety and Security and is Inconsistent with Correctional Best-Practices*

64.    As set forth above, placement in solitary confinement is due to Angola's blanket policy rather than the result of disciplinary violations or individualized considerations of an individual's behavior; at Angola, Death Row prisoners are kept in solitary confinement merely because of their criminal sentence.

65.    A 2016 report by the DOJ concerning the use of restrictive housing recommends that, "[c]orrectional systems should always be able to clearly articulate the specific reason(s) for an inmate's placement and retention in restrictive housing."[27]  The reason(s) should be supported by objective evidence.   Additionally, the report observes that "[r]estrictive housing should always serve a specific penological purpose."[28]

66.    Angola's current blanket policy of housing all Death Row prisoners in solitary confinement serves no penological purpose.

67.    A report by the National Institute of Justice of the DOJ found that "almost no literature documents the utility of [administrative segregation] or demonstrates that the use of

---

[25] John E. Dannenberg, Confronting Confinement, A Report On Safety and Abuse In America's Prisons (Feb. 15, 2007), Prison Legal News, goo.gl/OfiEJb.

[26] APA, Position Statement on Segregation of Prisoners with Mental Illness (2012), goo.gl/r2LXEl.

[27] Report and Recommendations Concerning the Use of Restrictive Housing, *supra* note 21, at 94.

[28] *Id.*

[restrictive housing] has achieved specific aims in demonstrable ways . . . . [I]t is virtually impossible to find empirical evidence supporting its utility or efficacy."[29]

68.    Angola has claimed, without any justification, that Death Row prisoners are housed on Death Row "in order to continue to provide[] adequate security and safety for employees, the general public, and other offenders and also uphold the regulations of the department."

69.    Angola's blanket policy of housing everyone on Death Row in solitary confinement is inconsistent with accepted correctional practices. Studies show prisoners convicted of murder are not more violent and are no more of a security risk than prisoners convicted of other crimes.  Additionally, their rates of "violent or assaultive rule infractions" have been found "below or near the mean for the entire inmate cohort."[30]

70.    A study conducted by forensic psychologists comparing the institutional violence histories of death-sentenced prisoners with those of prisoner groups living in conditions similar to general population at Potosoi Correctional Center, a maximum-security facility in Missouri, shows death-sentenced individuals who are classified using the same processes as other prisoners and are sometimes integrated into general population have rates of institutional violence that are equivalent to prisoners sentenced to life without parole and significantly lower than parole-eligible inmates.[31]

---

[29] Natasha A. Frost & Carlos E. Monteiro, *Administrative Segregation in U.S. Prisons: Executive Summary* 4, Nat'l Inst. of Justice (Mar. 2016), goo.gl/43Qt8t.

[30] Jon Sorensen & Mark D. Cunningham, *Conviction Offense and Prison Violence: A Comparative Study of Murderers and Other Offenders*, 56 CRIME & DELINQUENCY 103, 114 (2010), goo.gl/ecg3qR.

[31] Mark D. Cunningham et al., *Is Death Row Obsolete? A Decade of Mainstreaming Death-Sentenced Inmates in Missouri*, 23 BEHAV. SCI. LAW 307, 316-319 (2005), http://onlinelibrary.wiley.com/doi/10.1002/bsl.608/epdf.

71.     In fact, death-sentenced prisoners are statistically less violent than prisoners who are eligible for parole.[32]   Other prisoners at Angola who have been convicted of murder, including former Death Row prisoners serving life sentences, are frequently housed in the main prison, are able to participate in prison programming and are not locked in their cells for twenty-three hours a day.

72.     Best correctional practices dictate that an individualized assessment and classification is appropriate for death-row inmates rather than a blanket assignment to the significant dangers of solitary confinement.   In a brief supporting prisoners challenging an almost identical death row solitary confinement policy, corrections directors and administrators, including former directors of several state prison systems around the country, cited evidence showing that individualized assessment and classification based on objective factors, such as age and disciplinary history, is more predictive for security purposes than classifications based on conviction status.[33]  They cited the work of Dr. James Austin, who has written and researched extensively on prison classification and promotes overhauling the traditional classification system.  Dr. Austin advocates introducing a classification model that focuses on objective factors that are predictive of a prisoner's behavior, such as age, recent disciplinary action, or history of violence while incarcerated rather than non-predictive factors such as the severity of the offense or sentence length.[34]  The premise of reclassification is that "errors" can be made at the initial classification stage and should be fixed based on the prisoner's current behavior.

---

[32] *Id.* at 316.

[33] Brief of Amici Curiae Correctional Experts in Support of Appellee at 21, Doc No. 36-1, *Prieto v. Clarke*, No.13-8021 (4th Cir. June 4, 2014).

[34] James Austin, *Findings in Prison Classification and Risk Assessment* 5, Nat'l Inst. of Corr. (June 2003), goo.gl/Tx0rYw ("Very few persons convicted of murder, a sex offense, or with a long prison term become management problems or escape.").

73.    The Association of State Correctional Administrators issued a report calling prolonged isolation of inmates in jails and prisons "a grave problem in the United States."[35]  That report analyzes the use of solitary confinement across the country and notes nationwide efforts to improve restrictive housing conditions, focusing specifically on jurisdictions revising the criteria for being placed in solitary confinement.[36]

74.    The ABA's *Standards for Criminal Justice, Treatment of Prisoners* instructs that while death-sentenced prisoners might be separated from other inmates, they should be housed in comparable conditions to those of the general population, with solitary confinement being used only for brief periods, only when related to compelling reasons of security, crime or discipline, and only with adequate process.[37]

### Death Row Violates International Norms

75.    The United States is a party to international conventions bearing on the issue of prolonged solitary confinement.[38]  The United States has ratified the International Covenant on Civil and Political Rights (ICCPR) (ratified by the United States in 1992) and the Convention

---

[35] Aiming to Reduce Time-In-Cell Restrictions, *supra* note 3.

[36] *Id.*

[37] *Treatment of Prisoners supra* note 23, at 50, 57 (Standards 23-2.6(a), 23-2.9).

[38] International courts have also unanimously condemned the use of prolonged solitary confinement.  The Inter-American Court of Human Rights (IACHR) has repeatedly found violations of international human rights law for prolonged solitary confinement.  For example, in *Montero Aranguren et al. (Detention Center of Catia v. Venezuela*, the Court held that "solitary confinement cells must be used as disciplinary measures or for the protection of persons only during the time necessary and in strict compliance with the criteria of reasonability, necessity and legality." *Montero Aranguren et al (Detention Center of Catia v. Venezuela*, Preliminary Objection, Merits, Reparations and Costs, Judgment, Inter-Am. Ct. H.R. (ser. C) No. 150, ¶ 94 (July 5, 2006) (footnote omitted), goo.gl/83ighj.  In *Velásquez-Rodríguez v. Honduras*, the IACHR held that "prolonged isolation and deprivation of communication is in itself cruel and inhuman treatment which harms the psychological and moral integrity of the person, and violates the right of every detainee … to treatment respectful of his dignity." *Velásquez-Rodríguez v. Honduras,* Merits, Judgment, Inter-Am. Ct. H.R. (ser. C) No. 4, ¶ 187 (July 21, 1989), goo.gl/4SvJAV. Similarly, the European Court of Human Rights held in *A.B. v. Russia* that detaining an individual in solitary confinement for three years constituted a violation of Article 3 of the European Convention on Human Rights which prohibits "torture or inhuman or degrading treatment or punishment." *A.B. v. Russia*, App. No. 1439/06, ¶ 94 (Oct. 14, 2010), goo.gl/nKbrBc.

Against Torture (CAT) (ratified by the United States in 1994), both of which prohibit torture and other cruel, inhuman, or degrading treatment or punishment.  Both have been interpreted to prohibit the use of prolonged solitary confinement.

76.    Article 10 of the ICCPR mandates that "the penitentiary system shall comprise treatment of prisoners the essential aim of which shall be their reformation and social rehabilitation."[39]  The United Nations Human Rights Committee (UNHRC) has clarified that the ICCPR's prohibition of torture and other cruel, inhuman or degrading treatment under international law includes physical as well as mental pain and asserted "that prolonged solitary confinement" may violate this prohibition.[40]

77.    Article 1 of the CAT defines torture as:

> [A]ny act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as . . . punishing him for an act he or a third person has committed . . . when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.[41]

78.    In a 2011 report to the General Assembly, the United Nations' (U.N.) Special Rapporteur on torture, Juan Mendez stated that prolonged solitary confinement was prohibited by the ICCPR and CAT.  He further concluded that the assessment of whether solitary confinement amounts to torture should be conducted in light of the totality of the circumstances and on a case-by-case basis.  Mendez wrote, "No prisoner, including those serving life sentence

---

[39] ICCPR, art. 10, Dec. 19, 1966, 999 U.N.T.S. 176.

[40] Human Rights Comm. on Its Forty-Fourth Session, General Comment 20, art. 6, U.N. Doc. HRI/GEN/1/Rev.9 (Mar. 1992), http://ccprcentre.org/ccpr-general-comments.

[41] Convention against torture and other cruel, inhuman or degrading treatment or punishment art. 1, Dec. 10, 1984, 1465 U.N.T.S. 113-114.

and prisoners on death row, shall be held in solitary confinement merely because of the gravity of the crime."[42]

79.    On Death Row, no factor other than the sentence of the prisoners is taken into consideration and the indefinite nature of their confinement is in direct violation of the ICCPR and CAT.

80.    Additionally, in 2015, the U.N. General Assembly adopted the U.N. Standard Minimum Rules for the Treatment of Prisoners, known as the "Nelson Mandela Rules." The Rules specifically prohibit the practice of solitary confinement that is "indefinite" or "[p]rolonged," which they define as a "period in excess of [fifteen] consecutive days," and emphasize that solitary confinement should be used only as a last resort, for the shortest amount of time possible and should be subject to independent review by a competent authority.[43] Solitary confinement is defined by the Nelson Mandela Rules as "confinement of prisoners for 22 hours or more a day without meaningful human contact," and "prolonged solitary confinement" is defined as "a time period in excess of 15 consecutive days."[44]

81.    Additionally, in its Periodic Report to the U.N. Committee Against Torture, the United States confirmed that persons with a "serious mental illness" cannot be held in solitary confinement because it violates the Eighth Amendment's right to be free from cruel and unusual punishment. It further confirmed that subjecting a prisoner to solitary confinement without an

---

[42] Rep. of the Special Rapporteur on Its Sixty-Eighth Session, *Torture and other cruel, inhuman or degrading treatment or punishment,* ¶ 61, U.N. Doc. A/68/295 (Aug. 9, 2013), goo.gl/0VntF3.

[43] *See* U.N. Office on Drugs & Crime, *The United Nations Standard Minimum Rules for the Treatment of Prisoners* R. 44, at 14, goo.gl/cPT93i (last visited Mar. 16, 2017); Rep. of the Comm. against Torture on Its Fifty-Third Session, *Concluding observations on the combined third to fifth periodic reports of the United States of America,* ¶ 20, U.N. Doc. CAT/C/USA/CO/3-5 (Dec. 19, 2014), goo.gl/K4331B; G.A. Res. 70/175, annex, *United Nations Standard Minimum Rules for the Treatment of Prisoners (the Nelson Mandela Rules)* (Jan. 8, 2016), goo.gl/x9tKkU.

[44] Comm. against Torture*, supra* note 43.

administrative hearing is a violation of the Fourteenth Amendment's guarantee of due process. As a result, the Committee Against Torture has stated, "The [United States] should . . . [l]imit the use of solitary confinement as a measure of last resort, for as short [a] time as possible, under strict supervision and with the possibility of judicial review."[45]

82.    The Inter-American Commission on Human Rights (IACHR) issued a 2011 report that specifically addressed solitary confinement of death-sentenced prisoners finding that prisoners on death row should not be subjected to harsher conditions of imprisonment just because of their sentence, and more specifically, that they should not be confined to prolonged and indefinite solitary confinement.  Prisoners "sentenced to death should not be subjected to harsher conditions of imprisonment."[46]  The report further stated, "[i]t is not reasonable to presume that all convicts sentenced to capital punishment necessarily have to be imprisoned under maximum security."[47]

83.    Additionally, the IACHR has reiterated its concerns about the use of solitary confinement by stating that "Member States must adopt strong, concrete measures to eliminate the use of prolonged or indefinite isolation under all circumstances."[48]  The Commission has specifically stated that the use of solitary confinement "should be absolutely prohibited . . . for persons with mental disabilities, and for death row and life-sentenced prisoners by virtue of their sentence."[49]

---

[45] Comm. against Torture, *supra* note 43.

[46] IACHR., Report on the Human Rights of Persons Deprived of Liberty in the Americas ¶ 517 (Dec. 31, 2011), goo.gl/ychkrJ.

[47] *Id.*

[48] Press Release, IACHR, IACHR Expresses Concern over Excessive Use of Solitary Confinement in the United States (July 18, 2013), goo.gl/xgJa8j.

[49] *Id.*

## CLASS ACTION ALLEGATIONS

84.    Plaintiffs bring this action on behalf of themselves and all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(a), (b)(1) and (b)(2).

85.    Plaintiffs seek to represent the Class Members, who are a class consisting of all Death Row prisoners housed in solitary confinement at Louisiana State Penitentiary in Angola, Louisiana, as well as other prisoners sentenced to death at Angola who are similarly situated, none of whom have been or will be given meaningful review of their placement in solitary confinement, in violation of the Due Process Clause of the Fourteenth Amendment.

86.    Plaintiffs also seek to represent a class of Death Row prisoners who are now, or will be, housed in solitary confinement on Death Row under the conditions described above for more than five continuous years (the "Eighth Amendment Class").  These conditions constitute cruel and unusual punishment, which is prohibited by the Eighth Amendment.

87.    The class is so numerous that joinder of all members is impracticable.  Fed. R. Civ. P. 23(a)(1).  As of March 2017, there are more than seventy prisoners who have been living in solitary confinement on Death Row.  Nearly eighty percent of the Death Row prisoners have been kept in solitary confinement for over ten years.

88.    There are questions of law and fact common to the members of the class, including but not limited to: (1) whether the policy that all Death Row prisoners be housed in prolonged solitary confinement violated the due process rights of the prisoners guaranteed by the Fourteenth Amendment; (2) whether this policy constitutes cruel and unusual punishment proscribed by the Eighth Amendment; and (3) whether there is a penological reason to house prisoners for decades in solitary confinement only because they were sentenced to death and

without a showing that they currently pose a danger or security risk to other prisoners or prison officials.

89.     The claims of the named Plaintiffs are typical of those of the class.  The named Plaintiffs and the Class Members are all suffering a deprivation of basic human needs due to the same conditions of confinement.  While the exact nature of the harms suffered differs slightly for each prisoner, the source of the harm for each individual is the policy and practice of placing all Death Row prisoners in conditions of prolonged solitary confinement that have been shown to cause similar serious mental and physical harm.

90.     Plaintiffs are capable of fairly and adequately representing and protecting the interests of the class.  Plaintiffs do not have interests that are inconsistent with those of the class, and they are adequately represented by counsel, who are experienced in class action cases and civil rights, specifically prisoners' rights, litigation.

91.     This action is maintainable as a class action pursuant to Federal Rule of Civil Procedure 23(b)(1).  The numerous number of class members creates a risk that prosecution of separate actions by individuals would result in inconsistent and varying adjudications that would establish incompatible standards of conduct for Defendants.  Additionally, prosecution of separate actions by individuals would substantially impede the ability of other members to protect their interests.

92.     This action is maintainable as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) because the Angola policy of subjecting all Death Row prisoners to solitary confinement is applicable to all Class Members, injunctive relief is an appropriate remedy for all members of the class, and there exist common questions of law and fact.

## CAUSES OF ACTION

### First Cause of Action

**Declaratory Judgment and Injunctive Relief for Violations of
Eighth and Fourteenth Amendments (Cruel and Unusual Punishment)
Against all Defendants in their official capacities
On behalf of named Plaintiffs and Eighth Amendment Class Members**

93.     Plaintiffs incorporate by reference each and every allegation contained in Paragraphs 1-92 as if set forth fully herein.

94.     Plaintiffs bring this claim on their own behalf, and on behalf of the Eighth Amendment Class, against all Defendants.

95.     Angola's policy and practice of automatically placing all Death Row prisoners in solitary confinement have deprived and continue to deprive Plaintiffs and members of the class of basic human needs.  This practice violates their human dignity and their constitutional right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments of the Unites States Constitution.  Specifically, Defendants' policies and practices are cruel and unusual because they deprive Plaintiffs and Eighth Amendment Class Members of basic human needs, impose serious and irreparable psychological and physical injury and violate present-day concepts and standards of human dignity.

### *Deprivation of Basic Human Needs*

96.     The physical and psychological consequences of long term isolation constitute a severe denial of human fundamental needs, including but not limited to lack of human interaction, sensory stimulation, sleep deprivation and adequate physical exercise.

*Imposition of Serious Psychological and Physical Injury*

97.    This extensive deprivation of basic human needs causes intense psychological anguish and is likely to result in lasting psychological and physical injury to Plaintiffs and Class Members.

98.    The indefinite and undetermined length of solitary confinement the Plaintiffs and Class Members are subjected to poses significant risk of potentially incapacitating and permanent mental illness and physical harm.

*Deprivation of Human Dignity in Violation of Contemporary Standards of Human Decency and Disproportionate Punishment*

99.    Defendants' policy of indefinite and lengthy placement in solitary confinement inflicts disproportionate punishment on Plaintiffs and Class Members.

100.    Housing prisoners in these cruel conditions simply because they were sentenced to death serves no valid, legal purpose.  This policy has no legitimate rationale and does not serve any security needs.

101.    Defendants' decades-long infliction of mental and physical harm on Plaintiffs and Class Members strips them of their dignity and worth, transgresses civilized society's notions of decency and constitutes a practice that is disavowed in modern society.

102.    The fact that Louisiana's practices with respect to Plaintiffs and Class Members violate present-day society's concept and standards of human dignity is also evidenced by the international community's universal denunciation of extended solitary confinement.

*Defendants' Deliberate Indifference to the Deprivations Suffered by Plaintiffs*

103.    The policies that Angola applies to Death Row prisoners have been and continue to be implemented by Defendants.

104.    Literature condemning prolonged and indefinite solitary confinement is extensive and unanimous in its conclusions on the harms of solitary confinement.  Defendants have been on notice and continue to be on notice of all the deprivations stated above and yet have upheld the Death Row policy.

105.    The mental anguish and suffering arising out of the conditions that Plaintiffs and Class Members are confined to and their long-term effects should be evident to Defendants and to any reasonable person.  Furthermore, Defendants have frequently been made aware, through administrative grievances and written complaints, that Plaintiffs and Class Members are presently suffering substantial and ongoing injury.

106.    As a direct and proximate result of Defendants' constitutional violations described above, Plaintiffs and Eighth Amendment Class Members will be irreparably injured.  Plaintiffs and Eighth Amendment Class will have no adequate remedy at law for Defendants' actions.  Plaintiffs and Eighth Amendment Class Members will suffer irreparable harm to their constitutional rights unless Defendants are enjoined from continuing their unlawful policies, practices and/or customs which have directly and proximately caused to these constitutional abuses.

107.    Additionally, an actual controversy exists regarding the constitutionality of Defendants' practices and policies regarding the placement of all Death Row prisoners in solitary confinement.  A declaration on this issue will resolve that portion of the controversy between the parties, and the Court's determination of the issues will guide Defendants' actions.

## Second Cause of Action

### Declaratory Judgment and Injunctive Relief for Violations of the Fourteenth Amendment (Due Process)
### Against all Defendants in their official capacities
### On behalf of named Plaintiffs and Class Members

108.    Plaintiffs incorporate by reference each and every allegation contained in Paragraphs 1-107 as if set forth fully herein.

109.    Plaintiffs bring this claim on their own behalf, and on behalf of the class, against all Defendants.

110.    By denying Plaintiffs and Class Members any review whatsoever of their prolonged placement in solitary confinement and not giving them the ability to be removed from their complete isolation, Defendants are denying Plaintiffs and Class Members liberty without due process of law in violation of the Fourteenth Amendment to the United States Constitution.

111.    The conditions and the length of confinement to which Plaintiffs and Class Members are subjected constitute an atypical and significant hardship as compared with the ordinary incidents of prison life for three reasons: (1) the complete isolation on Death Row; (2) the indefinite nature of their confinement; and (3) their inability to challenge their placement in solitary confinement.

### *Conditions on Death Row*

112.    The conditions of Death Row are unjustifiably severe.  Prisoners are forced to live in complete isolation in windowless cells. Their ability to exercise is limited, and they are afforded few visits and are denied even minimal mental stimulation.

### *Duration of Confinement at Angola*

113.    Plaintiffs and Class Members have been held in these devastating conditions between five and thirty-one years.  Nearly eighty percent of the Death Row prisoners have been held in solitary confinement for over ten years.

### *Lack of Any Process*

114.    Plaintiffs and Class Members are provided no notice of what they can do to be removed from solitary confinement and their placement is not given any form of review to decide whether they still require confinement in complete isolation.

115.    Defendants violate the due process rights of Plaintiffs and Class Members by forcing them to live in conditions that amount to atypical and significant hardship without procedural protections.  No evidence suggests that this policy promotes safety and security of the prison and its staff.

116.    As a direct and proximate result of Defendants' constitutional violations described above, Plaintiffs and Class Members will be irreparably injured.  Plaintiffs and Class Members will have no adequate remedy at law for Defendants' actions.  Plaintiffs and Class Members will suffer irreparable harm to their constitutional rights unless Defendants are enjoined from continuing their unlawful policies, practices and/or customs which have directly and proximately caused these constitutional abuses.

117.    Additionally, an actual controversy exists regarding the constitutionality of Defendants' practices and policies regarding the placement of all Death Row prisoners in solitary confinement.  A declaration on this issue will resolve that portion of the controversy between the parties, and the Court's determination of the issues will guide Defendants' actions.

### Third Cause of Action

**Damages for violations of the Eighth and Fourteenth Amendments (Cruel and Unusual Punishment)**
**Against all Defendants in their individual capacities**
**On behalf of named Plaintiffs**

118.    Plaintiffs incorporate by reference each and every allegation contained in Paragraphs 1-117 as if set forth fully herein.

119.    Defendants individually and together in their individual capacity continuously implemented the policies alleged above.

120.    Defendants' policies and practices violate standards for human dignity and the constitutional right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments of the United States Constitution.  Defendants' policies and practices are cruel and unusual because they deprive Plaintiffs of basic human needs, impose serious and irreparable psychological and physical injury and violate present-day concepts and standards of human dignity.

121.    As a proximate result of Defendants' constitutional violations, Plaintiffs suffered damages in an amount to be proven at trial.

### Fourth Cause of Action

**Damages for violations of the Fourteenth Amendment (Due Process)**
**Against all Defendants in their individual capacities**
**On behalf of named Plaintiffs**

122.    Plaintiffs incorporate by reference each and every allegation contained in Paragraphs 1-121 as if set forth fully herein.

123.    Defendants individually and together in their individual capacities continuously implemented the policies alleged above.

124.    Defendants' policies and practices violate the Fourteenth Amendment of the United States Constitution by denying Plaintiffs liberty without due process of law.  Plaintiffs are denied any review whatsoever of their prolonged placement in solitary confinement and are denied the ability to be removed from their complete and prolonged isolation.

125.    As a proximate result of Defendants' constitutional violations, Plaintiffs suffered damages in an amount to be proven at trial.

**WHEREFORE,** the named Plaintiffs and Class Members pray for judgment against the Defendants:

(a) Declaring that this lawsuit is maintainable as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1) and (2);

(b) Declaring that Defendants' policies and practices of confining all prisoners sentenced to Death Row in indefinite solitary confinement with no opportunity for review violates the Eighth and Fourteenth Amendments of the United States Constitution;

(c) Granting permanent injunctive relief enjoining Defendants and their predecessors, successors, present or former agents, representatives, those acting in privity and concert with them, or on their behalf, from violating the Eighth and Fourteenth Amendments of the United States Constitution;

(d) Granting permanent injunctive relief requiring Defendants to present a plan to the Court within 30 days that provides for:

i. the release from solitary confinement of those prisoners whose isolation constitutes cruel and unusual punishment and of those prisoners whose placement in isolation comports with meaningful process and is not

arbitrary and capricious, and placement of those prisoners in either (i) a general population unit, or (ii) in a modified general population unit, in which the prisoners segregated from the general population have the same privileges as do prisoners in general population;

ii. alleviation of the conditions of confinement of all prisoners on Death Row so that prisoners no longer are incarcerated under conditions of isolation, sensory deprivation and lack of social and physical human contact;

iii. mandatory physical exams, mental health treatment and other necessary rehabilitation and medical treatment by non-Angola providers for all prisoners on Death Row;

iv. meaningful review of the need for solitary confinement for all prisoners currently on Death Row and those to be placed on Death Row; and

v. all other relief to which the class is entitled;

(e) Awarding Plaintiffs the compensatory damages they have sustained as a consequence of Defendants' Constitutional violations;

(f) Awarding Plaintiffs punitive and nominal damages;

(g) Awarding Plaintiffs and Class Members costs and reasonable attorney's fees;

(h) Granting Plaintiffs prejudgment and post judgment interest; and

(i) Granting such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a **trial by jury** on all issues so triable.

Dated: New Orleans, Louisiana
      March 29, 2017

 

*s/* Nicholas Trenticosta
Nicholas Trenticosta, Esq.
LSBA 18475
7100 Saint Charles Ave
New Orleans, LA 70118
(504) 864-0700
(504) 864-0780
nicktr@bellsouth.net

Pieter Van Tol, Esq.
Nicole E. Schiavo, Esq.
Robin L. Muir, Esq.
Garima Malhotra, Esq.
Elizabeth A. Seaver, Esq.
HOGAN LOVELLS US LLP
Motions to Appear *pro hac vice* to be filed
875 Third Avenue
New York, NY 10022
Phone: (212) 981-3000
Facsimile: (212) 981-3100
E-mail: pieter.vantol@hoganlovells.com
      nicole.schiavo@hoganlovells.com
      robin.muir@hoganlovells.com
      garima.malhotra@hoganlovells.com
      elizabeth.seaver@hoganlovells.com

Betsy Ginsberg, Esq.
CARDOZO CIVIL RIGHTS CLINIC
Motion to Appear *pro hac vice* to be filed
Benjamin N. Cardozo School of Law
55 5th Avenue, 11th Floor
New York, NY 10003
(212) 790-0871
betsy.ginsberg@yu.edu

***Attorneys for Plaintiffs***

Hasnaa El Rhermoul
Lekha Menon

***Legal Interns***